**SKELLY OIL COMPANY, a Corporation, Respondent,**

v.

**Tom A. ASHMORE and Madelyn Ashmore, Appellants.**

**No. 47911.**

Supreme Court of Missouri,

En Banc.

March 11, 1963.

Emerson Foulke, Joplin, for appellants.

William T. Robbins, Kansas City, Robert E. Seiler, Joplin, Seiler, Blanchard & Van Fleet, Joplin, of counsel, for respondent.

HYDE, Judge.

This suit for specific performance was transferred by Division Two to the Court en Banc because of the dissent of one of the Judges. We adopt the statement of facts, the statement of the contentions of the

parties and the ruling on the validity of the contract involved from the Divisional opinion as hereinafter set out without quotation marks.

This is a suit by the purchaser, Skelly Oil Company, a corporation, against the vendors, Tom A. Ashmore and Madelyn Ashmore, husband and wife, in two counts. Count One is for the specific performance of a contract to sell the north half of a certain described southwest corner lot (fronting 97½ feet on Main and 195 feet on 42nd Streets) in that part of Joplin lying in Newton County. Count Two seeks an abatement in the purchase price of $10,000, being the proceeds received by the vendors under an insurance policy on a building on the property, which building was destroyed by fire in the interim between the execution of the contract of sale and the time for closing of said sale by the exchange of the $20,000 consideration for the deed to the property. The case was tried in Jasper County upon a change of venue granted from Newton County. The trial court found the issues in favor of the purchaser, decreed specific performance, and applied the $10,000 insurance proceeds on the $20,000 purchase price. The vendors have appealed.

The vendors acquired this property about 1953, and operated a grocery store in the concrete block building, with fixtures and furniture, and a one story frame "smoke house" thereon. Deeds of trust on the property, securing notes of the vendors to the Bank of Neosho were of record. At all times here material and up to September 30, 1961, the property was leased to Don Jones at a rental of $150 a month. The vendors had a fire insurance policy, with a standard mortgage clause in favor of the Bank of Neosho attached, on the buildings and fixtures, issued February 8, 1958, for a term of one year.

Joe Busby, of the Kansas City office of the Skelly Oil Company real estate department, and Mr. Ashmore conducted the negotiations resulting in the contract of sale. The Ashmores lived in Lawton, Oklahoma. Mr. Ashmore had engaged in the real estate business since 1951. Busby secured the execution of a Skelly printed form of option by the vendors, dated July 31, 1957, for Skelly "to purchase" for the sum of $20,000, "payable in cash upon delivery of deed" said property, "together with the buildings, driveways, and all construction and equipment thereon, at any time before" August 31, 1957. The words "and equipment" were "x-ed" out on said option. The option provided in typewriting (referring to the Jones lease): "Purchaser agrees to honor present lease on above property until expiration." The option originally lapsed August 31, 1957. Busby had an agreement for the mutual cancellation of the lease prepared by Skelly's legal department for execution by the Ashmores and Jones, and on August 20 took up securing a cancellation of the lease and possession with Ashmore and his lawyer, Mr. Foulke. Mr. Foulke did not know how long this would take and the option was extended to January 1, 1958. Busby knew Ashmore filed an ejectment suit against Jones, was "patiently waiting" to hear from Mr. Foulke, and on trips to Joplin would inquire if any headway was being made on securing possession. On December 30, the option was extended to March 1, 1958. Skelly's legal department concluded this lease entitled Jones to possession until September 30, 1961. Skelly acquired the property immediately south of the Ashmore property, continued the operation of a service station thereon, and decided to go ahead and exercise the Ashmore option with Jones in possession under his lease and later combine the two properties and erect a service station that required more area than the Ashmore property.

Busby and Ashmore met in Joplin on February 25. Busby informed Ashmore Skelly had decided to purchase under its option with Jones in possession under his lease. The parties orally agreed to certain details, some being mentioned hereinafter in connection with the contract of sale. Busby also informed Ashmore Skelly could

not complete the transaction by March 1, and the Ashmores extended the option from March 1 to March 10, 1958. No consideration passed for any extension of the option.

The Bank of Neosho forwarded the abstract of title to Skelly.

The option provided it could be accepted "by giving written notice" to the vendors. By letter to the Ashmores under date of March 4, 1958, Skelly explicitly stated: "This letter is to inform you that Skelly Oil Company does hereby exercise its option to purchase the above described property for the sum of $20,000.00, subject to all the terms and conditions of the above referred to option, and with" further understandings, among others, to the effect: The fixtures and equipment in the store building were to remain the property of the Ashmores; the Ashmores were to assign the Jones lease to Skelly and Skelly was to remit to the Ashmores $5.00 a month for Jones' use of said fixtures and equipment; the Ashmores were to remove said fixtures and equipment within sixty days after the termination of said lease by lapse of time or otherwise, Skelly assuming no responsibility for the repair or physical condition of said fixtures and equipment. The letter also stated that upon approval of the title and the obtaining of necessary permits "we will get in touch with you further toward closing." Immediately following the signature of the purchaser on said letter appears: "ACKNOWLEDGED and AGREED TO This 7th day of March, 1958, Tom A. Ashmore Madelyn Ashmore." The vendors mailed the original thereof to the purchaser.

The latter part of March Busby telephoned to Ashmore in Lawton and they agreed to meet in Joplin on April 16, 1958, to close the transaction.

The concrete block building, furniture and fixtures were destroyed by fire on April 7, 1958, without fault of either party.

Skelly's Kansas City headquarters advised Busby, who was in St. Joseph, on April 7 of the fire. The next day Busby telephoned Ashmore from Kansas City. In this conversation Ashmore said he had insurance on the building and fixtures, naming the company in Kansas City carrying it. Asked on cross-examination whether he told Ashmore the fire would have no effect on the deal, Busby answered: "I told him absolutely not, we would go through with our deal. Q. Just like it was? A. Sure, just like this contract, sir, we're obligated, we can't get out of it." Busby called the insurance company and was informed there was $10,000 insurance on the building and $4,000 on the fixtures. He reported this to the purchaser's legal department. Then, after research, the legal department concluded that Skelly was entitled to have the insurance on the building applied on the purchase price. The closing papers were prepared accordingly.

The closing of the transaction was considered by the parties on April 15, 16 and 17. Busby and Ashmore met on the evening of the 15th. Mr. Winbigler of Skelly's legal department arrived on the 16th. They informed Ashmore they were there to close the purchase of the property; that Skelly thought it was entitled to the insurance proceeds on the building and would like an assignment of the insurance proceeds. When Ashmore disagreed, they informed him Skelly would close the deal and pay him the contract price but would not waive its rights to the insurance proceeds in so doing. Ashmore would not agree to this. They then went to Mr. Foulke's office and informed him of the situation. Mr. Foulke told them he needed time to check into the matter before he could advise his client. Busby and Winbigler returned to Kansas City.

By letter dated April 26, 1958, the Ashmores notified Skelly that the "option agreement" was rescinded "because it was given without consideration and is therefore not binding on us and for the further reason that you have refused to complete the purchase unless we reduce the agreed price, which constitutes a breach of the terms of the agreement."

A month or so later the Phoenix Insurance Company, under the standard mortgage clause, paid the Bank of Neosho the balance due on the vendors' notes, $7,242.46, and $2,757.54, the balance of the $10,000 insurance on the building, to the vendors, and also paid the vendors the $4,000 insurance carried on the furniture and fixtures.

This purchaser's claims are founded on the contract of sale in its letter of March 4, 1958, and the option therein referred to, which letter was "acknowledged and agreed to" by the vendors. Said claims are not based on a mere option to purchase where the improvements on the property were damaged prior to the purchaser's exercise of the option. Vendor and Purchaser, 55 Am.Jur., § 27, p. 492; 91 C.J.S. Vendor & Purchaser § 4, p. 832; Annotations, 65 A.L.R.2d 989; 23 A.L.R. 1225.

The vendors say that the letter and option were prepared by the purchaser and ambiguities and doubts therein are to be resolved in favor of the vendors; that the purchaser paid no consideration for the option or the three extensions; that specific performance will result in inequity, hardship or loss to vendors (2 Restatement, Contracts, § 367; 81 C.J.S. Specific Performance § 40, p. 512; Miller v. Coffeen, 365 Mo. 204, 280 S.W.2d 100, 103), and that the trial court's decree of specific performance constitutes an abuse of discretion (2 Restatement, Id., § 359). It is stated that, since there was no binding contract between the parties prior to the letter of March 4, this letter was only an offer to purchase under the terms and conditions in the original option and said letter, which vendors could accept or reject; that the vendors retained possession and the option contained four or more conditions and the letter added others, and because of these "suspensive conditions" (55 Am.Jur., Vendor and Purchaser, § 401, p. 822) the plain intention of the parties was that the purchaser was not to be bound until all these contingencies were met and no specifically enforceable contract existed on April 7, the date of the fire.

We are not impressed with the vendors' broad position that no valid enforceable contract ever existed. The principal suspensive conditions under the option authorized the purchaser to withdraw its acceptance of the option "before the consummation of purchase by payment of the full purchase price" if, sufficiently stated, the purchaser be unable to secure the proper licenses, consents or permits for the erection, maintenance and operation of a service station of a type and according to a ground plan of its choice on the premises, or if any such licenses, consents or permits be revoked, or if the purchaser be enjoined from erecting and operating a service station on said premises. The option called for an abstract showing a merchantable title in the vendors, and the letter of March 4 stated: "Upon approval of title by our Legal Department and our obtaining all necessary permits, we will get in touch with you further toward closing." There was no objection to this condition in the letter and the parties made it definite by orally agreeing the last part of March upon April 16 for the closing date. Under the mentioned suspensive conditions, as well as others of less importance, when the vendors "acknowledged and agreed to" the contract of sale, the purchaser could not act arbitrarily, capriciously or in bad faith in invoking said provisions of the contract; and in consideration of the mutual promises a mutually enforceable contract of sale arose. Cummins v. Dixon, Mo., 265 S.W.2d 386, 393 [5, 13], 47 A.L.R.2d 441; Herzog v. Ross, 355 Mo. 406, 196 S.W.2d 268, 271 [7], 167 A.L.R. 407; Fullington v. Ozark Poultry Supply Co., 327 Mo. 1167, 39 S.W.2d 780, 782 [2–4]; Underwood Typewriter Co. v. Century Realty Co., 220 Mo. 522, 119 S.W. 400, 403, 25 L.R.A.,N.S., 1173. And see German v. Gilbert, 83 Mo.App. 411, 417, 418; 2 Restatement, Contracts, § 376, comment a, § 372(1), comment a. None of the suspensive conditions entered into the vendors' failure to close the sale on April 16 or their rescission of the contract on April 26. The vendors' only objection to

completing the transaction was, as stated in their letter of rescission, "that you have refused to complete the purchase unless we reduce the agreed price," which, of course, refers to the purchaser's claim to the $10,000 insurance proceeds. Mr. Ashmore testified that the only thing that held up the closing of the transaction was Skelly Oil Company's claim to the insurance proceeds.

■■■ A further matter concerns the Bank of Neosho, its deeds of trust and the standard mortgage clause of the fire insurance policy under which said mortgagee received $7,242.46 of the insurance proceeds. The standard mortgage clause may be an independent contract between the insurer and the mortgagee (Trust Company of St. Louis County v. Phoenix Ins. Co., 201 Mo.App. 223, 210 S.W. 98, 102 [4]), but it was not an entirely disconnected contract in this case as a recovery by the mortgagee paid the debt of the mortgagors secured by this property and inured as much for the mortgagors' benefit as if they had recovered the loss and applied it otherwise (Swihart v. Missouri Farmers Mut. T., C. & W. Ins. Co., 234 Mo.App. 998, 138 S.W. 2d 9, 13[3, 4]). The Bank of Neosho has been paid without objection by either party and has no interest in the subject matter of this litigation. If at one time the mortgagee was a proper party to the suit (Swihart case, supra [6]), there was no objection in the pleadings to its nonjoinder and the fact does not now invalidate any judgment entered or to be entered in this cause (Ray v. Wooster, Mo., 270 S.W.2d 743, 753 [18, 19]).

■■■ The contract of sale here involved contained no provision as to who assumed the risk of loss occasioned by a destruction of the building, or for protecting the building by insurance or for allocating any insurance proceeds received therefor. When the parties met to close the sale on April 16, the purchaser's counsel informed vendors and their attorney he was relying on Standard Oil Co. v. Dye, 223 Mo.App. 926, 20

S.W.2d 946, for purchaser's claim to the $10,000 insurance proceeds on the building. Purchaser made no claim to the $4,000 paid vendors for the loss of the furniture and fixtures. It is stated in 3 American Law of Property, § 11.30, p. 90, that in the circumstances here presented at least five different views have been advanced for allocating the burden of fortuitous loss between vendor and purchaser of real estate. We summarize those mentioned: (1) The view first enunciated in Paine v. Meller (Ch. 1801, 6 Ves. Jr. 349, 31 Eng. Reprint 1088, 1089) is said to be the most widely accepted; holding that from the time of the contract of sale of real estate the burden of fortuitous loss was on the purchaser even though the vendor retained possession. (2) The loss is on the vendor until legal title is conveyed, although the purchaser is in possession, stated to be a strong minority. (3) The burden of loss should be on the vendor until the time agreed upon for conveying the legal title, and thereafter on the purchaser unless the vendor be in such default as to preclude specific performance, not recognized in the decisions. (4) The burden of the loss should be on the party in possession, whether vendor or purchaser, so considered by some courts. (5) The burden of loss should be on the vendor unless there is something in the contract or in the relation of the parties from which the court can infer a different intention, stating "this rather vague test" has not received any avowed judicial acceptance, although it is not inconsistent with jurisdictions holding the loss is on the vendor until conveyance or jurisdictions adopting the possession test. As to the weight of the authority, see also 27 A.L.R.2d 448; Tiffany, Real Property, 3rd ed., § 309.

We do not agree that we should adopt the arbitrary rule of Paine v. Meller, supra, and Standard Oil Co. v. Dye, supra, that there is equitable conversion from the time of making a contract for sale and purchase of land and that the risk of loss from destruction of buildings or other substantial part of the property is from that moment on the pur-

chaser. Criticisms of this rule by eminent authorities have been set out in the dissenting opinion of STORCKMAN, J., herein and will not be repeated here.

We take the view stated in an article on Equitable Conversion by Contract, 13 Columbia Law Review 369, 386, Dean Harlan F. Stone, later Chief Justice Stone, in which he points out that the only reason why a contract for the sale of land by the owner to another operates to effect conversion is that a court of equity will compel him specifically to perform his contract. He further states: "A preliminary to the determination of the question whether there is equitable ownership of land must therefore necessarily be the determination of the question whether there is a contract which can be and ought to be specifically performed *at the very time when the court is called upon to perform it.* This process of reasoning is, however, reversed in those jurisdictions where the 'burden of loss' is cast upon the vendee. The question is whether there shall be a specific performance of the contract, thus casting the burden on the vendee, by compelling him to pay the full purchase price for the subject matter of the contract, a substantial part of which has been destroyed. The question is answered somewhat in this wise: equitable ownership of the vendee in the subject matter of the contract can exist only where the contract is one which equity will specifically perform. The vendee of land is equitably entitled to land, therefore the vendee may be compelled to perform, although the vendor is unable to give in return the performance stipulated for by his contract. The *non sequitur* involved in the proposition that performance may be had because of the equitable ownership of the land by the vendee, which in turn depends upon the right of performance, is evident. The doctrine of equitable conversion, so far as it is exemplified by the authorities hitherto considered, cannot lead to the result of casting the burden of loss on the vendee, since the *conversion depends upon the question whether the contract should in equity be performed.* In all other cases where the vendee is treated as the equitable owner of the land, it is only because the contract is one which equity first determines should be specifically performed.

"Whether a plaintiff, in breach of his contract by a default which goes to the essence, as in the case of the destruction of a substantial part of the subject matter of the contract, should be entitled to specific performance, is a question which is answered in the negative in every case except that of destruction of the subject matter of the contract. To give a plaintiff specific performance of the contract when he is unable to perform the contract on his own part, violates the fundamental rule of equity that * * * *equity will not compel a defendant to perform when it is unable to so frame its decree as to compel the plaintiff to give in return substantially what he has undertaken to give* or to do for the defendant.

"The rule of casting the 'burden of loss' on the vendee by specific performance if justifiable at all can only be explained and justified upon one of two theories: first, that since equity has for most purposes treated the vendee as the equitable owner, it should do so for all purposes, although *this ignores the fact that in all other cases the vendee is so treated only because the contract is either being performed or in equity ought to be performed;* or, second, which is substantially the same proposition in a different form, the specific performance which casts the burden on the vendee is an incident to and a consequence of an equitable conversion, whereas in all other equity relations growing out of the contract, the equitable conversion, if it exists, is an incident to and consequence of, a specific performance. Certainly nothing could be more illogical than this process of reasoning." (Emphasis ours.)

For these reasons, we do not agree with the rule that arbitrarily places the risk of

loss on the vendee from the time the contract is made. Instead we believe the Massachusetts rule is the proper rule. It is thus stated in Libman v. Levenson, 236 Mass. 221, 128 N.E. 13, 22 A.L.R. 560: When "the conveyance is to be made of the whole estate, including both land and buildings, for an entire price, and the value of the buildings constitutes a large part of the total value of the estate, and the terms of the agreement show that they constituted an important part of the subject matter of the contract * * * the contract is to be construed as subject to the implied condition that it no longer shall be binding if, before the time for the conveyance to be made, the buildings are destroyed by fire. The loss by the fire falls upon the vendor, the owner; and if he has not protected himself by insurance, he can have no reimbursement of this loss; but the contract is no longer binding upon either party. If the purchaser has advanced any part of the price, he can recover it back. Thompson v. Gould, [supra] 20 Pick. [37 Mass.] 134, 138. If the change in the value of the estate is not so great, or if it appears that the buildings did not constitute so material a part of the estate to be conveyed as to result in an annulling of the contract, specific performance may be decreed, *with compensation for any breach of agreement*, or relief may be given in damages." (Emphasis ours.) See also Gillis v. Bonelli-Adams Co., 284 Mass. 176, 187 N.E. 535. An extreme case, showing the unfairness of the arbitrary rule placing all loss on the vendee, is Amundson v. Severson, 41 S.D. 377, 170 N.W. 633, where three-fourths of the land sold was washed away by the Missouri River (the part left being of little value) and the vendor brought suit for specific performance. Fortunately for the vendee, he was relieved by the fact that the vendor did not have good title at the time of the loss, although the vendor had procured it as a basis for his suit. However, if the vendor had then held good title even though he did not have the land, the vendee would have been required to pay the full contract price under the loss on the purchaser rule. (Would the vendee have been any better off if the vendor had good title from the start but did not have the land left to convey?) The reason for the Massachusetts rule is that specific performance is based on what is equitable; and it is not equitable to make a vendee pay the vendor for something the vendor cannot give him.

■ However, the issue in this case is not whether the vendee can be compelled to take the property without the building but whether the vendee is entitled to enforce the contract of sale, with the insurance proceeds substituted for the destroyed building. We see no inequity to defendants in such enforcement since they will receive the full amount ($20,000.00) for which they contracted to sell the property. Their contract not only described the land but also specifically stated they sold it "together with the buildings, driveways and all construction thereon." While the words "Service Station Site" appeared in the caption of the option contract and that no doubt was the ultimate use plaintiff intended to make of the land, the final agreement made by the parties was that plaintiff would take it subject to a lease of the building which would have brought plaintiff about $6,150.00 in rent during the term of the lease. Moreover, defendants' own evidence showed the building was valued in the insurance adjustment at $16,716.00 from which $4,179.00 was deducted for depreciation, making the loss $12,537.00. Therefore, defendants are not in a very good position to say the building was of no value to plaintiff. Furthermore, plaintiff having contracted for the land with the building on it, the decision concerning use or removal of the building, or even for resale of the entire property, was for the plaintiff to make. Statements were in evidence about the use of the building and its value to plaintiff made by its employee who negotiated the purchase but he was not one of plaintiff's chief executive officers nor possessed of authority to bind its board of directors. The short of the matter is that defendants will get all they bargained for;

but without the building or its value plaintiff will not.

We therefore affirm the judgment and decree of the trial court.

EAGER, LEEDY and HOLLINGSWORTH, JJ., concur.

STORCKMAN, J., dissents in separate opinion filed.

WESTHUES, C. J., and DALTON, J., dissent and concur in separate dissenting opinion of STORCKMAN, J.

STORCKMAN, Judge (dissenting).

I agree that the parties on March 7, 1958, entered into a valid contract for the transfer of the real estate, but in the circumstances I cannot assent to the holding that the plaintiff is entitled to specific performance on any terms other than those of the purchase contract without reduction in the contract price. In general, I agree with the rationale of the first divisional opinion written by Barrett, C., which was adopted but thereafter voided when a rehearing was granted. Portions of the Barrett opinion will be incorporated in this dissenting opinion without the use of quotation marks.

The evidence is convincing that Skelly Oil Company was buying the lot as a site for a service station and that in so using it they not only wanted the Jones's lease terminated but intended to tear down and remove the building in question. The contract documents support this conclusion. Both the option and the letter of acceptance refer to the property as a "service station site" and contain escape clauses permitting Skelly to avoid the purchase agreement if proper permits could not be obtained or if zoning laws prohibited such use. From the time the option was first granted on July 31, 1957, through its various extensions, until the letter of March 4, 1958, Mr. Busby, Skelly's real estate representative, was cooperating with and urging Mr. Ashmore and his attorney to secure a termination of the Jones's lease (which was on the entire property) even to the extent of filing an ejectment suit against the lessee. Then after the fire Skelly's legal department prepared as one of the closing documents an agreement to be executed by the Ashmores and the Jones for mutual cancellation of the lease. The purchase contract calls for an assignment of the Jones's lease by the Ashmores to Skelly and its honoring the lease; but, at the request of Mr. Busby, the Ashmores on April 17, 1958, with the approval of their attorney, executed and delivered to Mr. Busby the mutual cancellation agreement. This conduct is consistent with its prior activities, but is inconsistent with plaintiff's present contention that the building and its rental under the lease represented a substantial part of the consideration for the purchase of the real estate.

Count 1 of the petition is for specific performance in accordance with the terms of the purchase contract; Count 2 seeks a declaration that the defendants hold the $10,000 insurance proceeds in trust for the benefit of the plaintiff and that the defendants be required to pay the proceeds to the plaintiff or that the amount thereof be applied in reduction of the purchase price of the property. Count 2 alleges that the concrete block, single-story building which was used as a grocery store was totally destroyed by fire, that the defendants collected the insurance thereon, and that "said building was a valuable appurtenance on said real estate worth more than $10,000.00 and that its destruction reduced the value of said real estate more than the sum of $10,000.00".

In spite of the issue made by Count 2 as to effect of the destruction of the building upon the value of the real estate, the trial court refused to permit cross-examination of plaintiff's witness to establish that the purpose and intent of Skelly was to remove the building from the premises when the lease was terminated, and the court rejected defendants' offer of proof to the same effect. In this equity action the testimony should have been received. It did not tend

to vary or contradict the written contract but dealt with an issue made by plaintiff's petition based on a partial destruction of the subject matter subsequent to the acceptance of the option. Nevertheless, there was other evidence from which it could be reasonably inferred that the use of the real estate as a filling station site necessitated the removal of the building. Mr. Ashmore testified that he originally asked $27,000 for the property but reduced his price on Mr. Busby's representation that the improvements had no value to Skelly and that Skelly would be glad to have Mr. Ashmore remove them.

The plaintiff introduced no evidence of the market value of the property before or after the fire in support of the allegations in Count 2. The amount paid by the insurance company is of little or no benefit as evidence of the actual value of the building because of the valued policy law of Missouri which provides that in case of the total destruction of a building by fire, insurance companies shall not be permitted to deny that the property insured was worth at the time of issuing the policy or policies the full amount for which the property was insured. Sections 379.140 and 379.145, RSMo 1959, V.A.M.S. Defendants' evidence tended to prove that the real estate was worth more as a site for a service station after the fire than before and that the value of the real estate after the fire was in excess of $20,000.

The claim of neither party is particularly compelling insofar as specific performance in this case is concerned. The destruction of the building by fire, its insurance, and the disposition of the insurance proceeds were matters not contemplated by the parties and not provided for in the purchase contract documents. Skelly's representative did not know that Mr. Ashmore carried insurance on the building until after the fire, and he then told Mr. Ashmore that despite the fire the deal would be closed on the agreed date. Skelly's present claims are an afterthought inconsistent with its conduct throughout the negotiations and prior to the closing date.

In short, as to both Skelly and the Ashmores, the destruction of the insured building was a fortuitous circumstance supplying the opportunity to rid the property of a vexatious lease, to dispose of the building, and at the same time resulting in a windfall of $10,000. And the problem, in fact the only seriously contested issue between the parties, is which of them is to have the advantage of this piece of good fortune. Skelly contracted to pay $20,000 for the property. If it is awarded the $10,000 windfall, it will receive a $20,000 lot for $10,000. If the Ashmores retain the $10,000, they will in fact have realized $30,000 for a piece of property they have agreed to sell for $20,-000.

In claiming the proceeds of the Ashmores' fire insurance policy, Skelly did not contend that the value of the real estate as a service station site had decreased. After learning of the fire and the existence of the insurance policy, Skelly's counsel did some research and, as he announced when the parties met in Joplin to close the deal, Skelly was relying on a case he had found, Standard Oil Company v. Dye, 223 Mo.App. 926, 20 S.W.2d 946. And in its basic facts the case, admittedly, is quite similar to this one although there were no attendant circumstances such as we have in the present case. As authority for its decision, the court in that case relied almost wholly on William Skinner & Sons' Shipbuilding & Dry-Dock Co. v. Houghton, 92 Md. 68, 48 A. 85. The doctrine of these two cases, laboriously evolved from Paine v. Meller, (1801) 6 Ves. Jr. 349, 31 Eng.Reprint 1088, is "that a contract to sell real property vests the equitable ownership of the property in the purchaser, with the corollary that any loss by destruction of the property through casualty during the pendency of the contract must be borne by the purchaser." Annotation 27 A.L.R.2d 444, 446. The twofold rationale of this doctrine is a maxim that "equity regards as done that which should have been done," from which it is said the "vendor becomes a mere trustee, holding the legal title for the benefit of

the purchaser or as security for the price." 27 A.L.R.2d 444, 448, 449. All of the experts and scholars seem to agree that this doctrine and its rationale is misplaced if not unsound. To illustrate see only 4 Williston, Contracts, §§ 928–943B, pp. 2605–2639. As to the maxim, Williston said, "Only the hoary age and frequent repetition of the maxim prevents a general recognition of its absurdity." 4 Williston, Contracts, § 929, p. 2607. As to the corollary, Williston points out that while the purchaser may have an interest in the property, it is equally clear that the vendor likewise has an interest, and as for the vendor's being a trustee for the purchaser observes, "However often the words may be repeated, it cannot be true that the vendor is trustee for the purchaser." 4 Williston, Contracts, § 936, p. 2622. See also Pound "The Progress of The Law—Equity", 33 Har.L.R. 813, 830.

Nevertheless, adapting this doctrine and following a majority opinion in another English case, Rayner v. Preston, (1881) L.R. 18 Ch.Div. 1 (CA), the rule as stated in the Dye case has evolved: "Where the purchaser as equitable owner will bear the loss occasioned by a destruction of the property pending completion of the sale, and the contract is silent as to insurance, the rule quite generally followed is that the proceeds of the vendor's insurance policies, even though the purchaser did not contribute to their maintenance, constitute a trust fund for the benefit of the purchaser to be credited on the purchase price of the destroyed property, the theory being that the vendor is a trustee of the property for the purchaser." Annotation 64 A.L.R.2d 1402, 1406. Many jurisdictions have modified or do not follow this doctrine, some take the view that the vendor's insurance policy is personal to him, and Parliament has enacted a statute which entirely changes the English rule. 4 Mo.L.R. 290, 296. The rule is not as general as the annotator indicated, and as with the rule upon which it is founded, all the experts agree that it is unsound, their only point of disagreement is as to what the rule should be. See 4

Williston, Contracts, §§ 928–943; Vance, Insurance, § 131, p. 777, and 34 Yale L.J. 87; Vanneman, "Risk of Loss, Between Vendor and Purchaser", 8 Minn.L.R. 127; Pound, "The Progress of The Law", 33 Har.L.R. 813, and the excellent student note to Standard Oil Co. v. Dye in 4 Mo. L.R. 290. The student note and the law review articles cite and discuss relevant cases which need not be repeated here.

Professor Williston was of the view that the risk of loss should follow possession (4 Williston, Contracts, §§ 940, 942), and that view has been written into the Uniform Vendor and Purchaser Risk Act. 9C U.L. A., p. 314 and 1960 Supp., p. 82. Eight states have adopted that act and four of those, California, New York, South Dakota, and Oregon, are listed among the fifteen jurisdictions said by the A.L.R. annotator (64 A.L.R. 1406) to follow the Dye case. In connection with the factor of possession only, it is an interesting sidelight to note, as an annotator has pointed out (27 A.L.R. 2d 464), that this court has held that "Where a vendee thus takes possession of real estate under a title bond from the vendor, and the improvements thereon are destroyed, the loss falls on the vendee." Walker v. Owen, 79 Mo. 563, 569. If possession is a factor, as that case indicates, the case has not been modified unless what the court said in Manning v. North British & Merc. Ins. Co., 123 Mo.App. 456, 461, 99 S.W. 1095, 1097, is to govern: "Possession is not a necessary requisite to the purchaser enjoying all the profits of his purchase, or standing for its depreciation. A valid contract of sale of real estate puts the equitable title in the vendee, although he may be out of possession."

Vance is of the opinion that a rule of "business usage" should be adopted, but he ruefully adds, "Here we have another instance in which business usage substitutes the insurance money for the insured property, despite the general rule that the two are not legally connected; and, as usual, the courts are sluggishly following business." Vance, Insurance, § 131, p. 781.

Dean Pound assails Vance's contention that the insurance money is any part of the thing bargained for and he also vigorously attacks the theory that the vendor is a trustee for the vendee. 33 Har.L.R., l. c. 829, 830; 4 Mo.L.R., l. c. 296.

Professor Vanneman has pointed out that the basic problem in all these cases is, "should there be a decree for specific performance at all?" He is of the view that the important and controlling factor should be the intention of the parties. If the building was a material part of the transaction, the vendor intending to sell and the vendee intending to buy "land with a building upon it," the vendee should have the benefit of the insurance. By way of summary, this is his view, "What is the intention of the parties here where incidents of ownership are divided? The court must decide this problem in each case rather than apply a rule of law that possession shows the intent of the parties. Let the matter rest frankly in the court's discretion. This may want in certainty but is not the problem in its nature incapable of settlement by an inflexible rule? * * * Where there is nothing from which a court can infer a different intention let the risk of loss lie with the vendor. Further than this it seems unwise to attempt to formulate a rule. Possession may or may not be a sufficiently controlling element. Since it usually carries other incidents of ownership it would show, in most cases, a reasonably inferable intention to shift the risk of loss, but it may not in a given case as above indicated. It is suggested that in those cases involving additional operative facts each case should be left to the court to decide as its exigencies require, unhampered by rule, thus sacrificing certainty to discretion in order to secure equity and justice in the individual case." 8 Minn.L.R., l. c. 141, 143. This view has the merit of avoiding resort to the legal fictions of equitable ownership and trusteeship.

A similar approach to this troublesome question was espoused by Dean Harlan F. Stone in his article entitled, "Equitable Con-version by Contract", 13 Columbia Law Review 369, 386, wherein he stated: "A preliminary to the determination of the question whether there is equitable ownership of land must therefore necessarily be the determination of the question whether there is a contract which can be and ought to be specifically performed at the very time when the court is called upon to perform it."

Automatic application of the doctrine that "equity regards that as done which ought to be done", in the circumstances of this case, begs the question of *what ought to be done*. Because the insurance proceeds may be a windfall to those legally entitled does not necessarily mean that justice will be accomplished by transferring them elsewhere. The substance of the purchase contract and the use to which the property is to be put must be considered. A resort to equity should involve a consideration of other equitable principles or maxims such as the equally important maxims that "equity follows the law" and "between equal equities the law will prevail".

A valid legal excuse is a sufficient reason for refusal of specific performance. 49 Am.Jur., Specific Performance, § 2, p. 7, states: "Neither party has any legal right to refuse to perform the obligations imposed, in the absence of a reservation of the right to terminate the contract upon some contingency, unless because of circumstances subsequently arising there exists some valid legal excuse for nonperformance." Destruction of a particular thing upon which the contract depends is generally regarded as a legal excuse for nonperformance according to 12 Am.Jur., Contracts, § 372, pp. 944–945, wherein it is stated: "In the absence of a contrary provision, if the act to be performed is necessarily dependent on the continued existence of a specific thing, the perishing thereof before the time for performance, without the fault of the promisor, will excuse nonperformance of the contract. This is especially true where, from the nature of the contract, it appears that the parties must, from the beginning, have known that it could not be fulfilled un-

less when the time for the fulfilment of the contract arrived, some particular specified thing continued to exist. The contract is not, in the absence of any express or implied warranty that the thing shall exist, to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible from the perishing of the thing without default of the contractor."

"It long has been settled in the English courts and in those of this country, federal and state, that where parties entered into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it." Texas Co. v. Hogarth Shipping Corp., 256 U.S. 619, 41 S.Ct. 612, 614, 65 L.Ed. 1123. Numerous authorities are cited in support of the above quotation. See also Restatement of the Law of Contracts, § 288; 17 C.J.S., Contracts, § 466, p. 960; St. Joseph Hay & Feed Co. v. Brewster, Mo.App., 195 S.W. 71, 72 [2]; Patch v. Solar Corp., 7 Cir., 149 F.2d 558, 560 [2]; and Tulsa Opera House Co. v. Mitchell, 165 Okl. 61, 24 P.2d 997, 1000 [1]. In the latter case, an opera building was totally destroyed by fire before the performance of a contract involving a transfer of the capital stock to third persons, and it was held that destruction of the building discharged each party from further liability under the contract.

The plaintiff's petition alleges that the building destroyed by fire "was a valuable appurtenance on said real estate worth more than $10,000.00 and that its destruction reduced the value of said real estate more than the sum of $10,000.00." So far as Skelly's use of the property as a service station site is concerned, this allegation cannot be true if Skelly's intent was to tear down and remove the building. On the other hand, if the plaintiff retained the property or sold to an investor who proposed to rent the building for a store or a similar business purpose, then the loss would be substantial and the insurance proceeds would be necessary to restore a suitable building. The petition asserts that "as a matter of law" the defendant held "said $10,000.00 insurance proceeds in trust for the benefit of plaintiff as the vendee of the defendants." I know of no equitable or legal principle that justifies the award of the insurance proceeds automatically to the purchaser in the circumstances of this case.

I cannot see that this court is bound by any precedent that can only be changed by an act of the general assembly. Specific performance is an equitable remedy and a part of our common law. Fidelity Loan Securities Co. v. Moore, 280 Mo. 315, 217 S.W. 286, 289 [9]. Standard Oil v. Dye is a court of appeals case in which the property was transferred to the purchaser under a reservation of the right to determine who was entitled to the insurance proceeds. The suit was not for specific performance of the contract itself but to recover the insurance proceeds; neither the facts nor the law applied in that case are determinative of a similar result in the instant case. Neither of the two supreme court cases relied on are controlling here. Snyder v. Murdock, 51 Mo. 175, 177, is a suit on promissory notes executed by defendant payable to plaintiff's testator. The defense was that the promissory notes had been given for land and fixtures for which plaintiff had given his title bond but which he had not conveyed, and that the fixtures, consisting of a carding machine and mill which gave value to the land and were the main inducement to the purchase, had been destroyed by fire. Judgment for plaintiff was affirmed on theory that the property was at the risk of the purchaser after execution of the contract for the conveyance, the bond for

title and the promissory notes on "the principle that in equity what is agreed to be done must be considered as done." In Walker v. Owen, 79 Mo. 563, 569, a vendee of improved real estate went into possession of the property under a contract for title. He paid a small amount on account of the purchase price and kept possession until the improvements were destroyed by fire. It was held that the vendee could not rescind the sale because he could not put the vendor in statu quo by restroing the property to the vendor and he could not invoke the statute of frauds as a defense.

"As a general rule, the specific performance of a contract by a court of equity is not a matter of absolute right in the parties demanding it, but the grant of specific performance is a matter of grace, and applications for such relief are addressed to the sound discretion of the court." 81 C.J.S. Specific Performance § 9, pp. 417–418. Numerous Missouri cases are cited in the footnotes in support of the above statement of law. I do not think that the evidence justifies the grant of the relief requested in Count 2 of plaintiff's petition. It is generally recognized that much less strength of proof is required to defeat specific performance than to enforce the remedy. Eisenbeis v. Shillington, 349 Mo. 108, 159 S.W.2d 641, 644.

If plaintiff's contention is that there has been a substantial failure or impairment of the consideration of the contract by reason of the destruction of the building, then I do not think that the Ashmores should be entitled to specific performance, and because of the theory of mutuality it would seem that Skelly would not be entitled to specific performance unless it was willing to perform its legal obligations under the purchase contract as drawn. We would not be justified in making a new contract for the parties to cover the building insurance, and a court of equity will not decree specific performance of a contract that is incomplete, indefinite or uncertain. Rayburn v. Atkinson, Mo., 206 S.W.2d 512, 514 [1]; State ex rel. Place v. Bland, 353 Mo. 639,

183 S.W.2d 878, 889 [18]; Ellison v. Wood Garment Co., Mo.App., 286 S.W.2d 27, 30; Blake v. Shower, Mo.App., 207 S.W.2d 775, 779 [4]. Nor can the courts supply an important element that has been omitted from the contract. Poole v. Campell, Mo., 289 S.W.2d 25, 32 [13].

The precise problem presented by this appeal has not heretofore been considered by the supreme court. The facts of this case demonstrate the unsoundness of a rigid and exclusive adherence to the doctrine that equity regards that as done which ought to be done. I would apply general equitable principles and first determine whether Skelly has established by clear, cogent and convincing evidence that it is entitled to have a trust declared in the insurance proceeds in accordance with the allegations of Count 2 of its petition. It is not enough to say that the Ashmores have been unjustly enriched because giving the fund to Skelly would result in its being unjustly enriched. Hoover v. Wright, Mo., 202 S.W.2d 83, 86 [2, 3]; Edwards v. Friborg, 361 Mo. 578, 235 S.W.2d 255. This would result in Skelly acquiring for $10,000 a filling station site for which it solemnly agreed to pay $20,-000. Swapping one inequity for another is no justification for disturbing the legal title.

If the subject matter of the purchase contract was not as well or better suited to Skelly's purpose after the fire than it was before, then it appears from the authorities above discussed that Skelly could avoid the contract entirely or that it could clearly establish the amount and manner in which it was damaged. What would the situation be if the building had not been insured or for only a small amount? The fact that the building was insured and the amount thereof are hardly determinative of Skelly's alleged injury.

But Skelly did not after the fire or in this action elect to abandon the contract although the Ashmores gave it the opportunity to do so rather than to sell at the reduced price. It is quite evident that

Skelly has received one windfall as the result of the fire in that the lease is terminated and the site can be cleared at less cost. It has not shown itself to be entitled to another, the one now legally vested in the Ashmores. Ideally the purchase contract should be set aside so that the parties could negotiate a new one based on the property in its present condition. But the plaintiff by its election to take title has foreclosed this possibility.

The foregoing part of this dissenting opinion was directed primarily at the Division 2 opinion by Bohling, C., and the first opinion by Hyde, J., en banc. I respectfully suggest that the second opinion written in banc by Hyde, J., still falls short of establishing and applying dependable standards for a case of this kind. This opinion, which will be referred to as the majority opinion, employs conflicting rules or theories. It purports to adopt one but applies another. It professes to repudiate the equitable conversion theory and to adopt unequivocally the Massachusetts rule, stating: "Instead we believe the Massachusetts rule is the proper rule." This rule as shown by the opinion's quotation from Libman v. Levenson, 236 Mass. 221, 128 N.E. 13, 22 A.L.R. 560, is that the sales contract will no longer be binding if the buildings are destroyed by fire and "the value of the buildings constitutes a large part of the total value of the estate, and the terms of the agreement show that they constituted an important part of the subject matter of the contract". In the same quotation from the Libman case, the circumstances and terms under which specific performance is granted are stated as follows: "If the change in the value of the estate is not so great, or if it appears that the buildings did not constitute so material a part of the estate to be conveyed as to result in an annulling of the contract, specific performance may be decreed, *with compensation for any breach of agreement, or relief may be given in damages.*" Emphasis added.

Obviously the majority opinion did not find that the value of the building constituted "a large part of the total value of the estate" or "an important part of the subject matter of the contract", else it would have declared the sales contract no longer binding under the Massachusetts rule. What it had to find was that the value of the building was not so great or such a material part of the estate to be conveyed as to interfere with the decree of specific performance.

But at this point the majority opinion abandons any pretense of following the Massachusetts rule and switches back to the equitable conversion theory and awards the insurance proceeds as such to the vendee without a determination of compensation for breach or relief to be given in damages. The value of the building for insurance purposes or as a structure to house a retail store is not necessarily the proper measure of the compensation or damages to which the plaintiff is entitled. It might be considerably less than such a figure if Skelly intended to remove the building as soon as it had the legal right to do so. Obviously the Massachusetts rule is not tied in with insurance at all and that is as it should be. Logically the majority opinion should have remanded the case for a determination of the amount of actual damages suffered by Skelly or the compensation to which it is entitled if it still wants specific performance. This is undoubtedly what the Massachusetts rule contemplates. I would find no fault with such a procedure.

Such evidence would also have a bearing on whether specific performance should be decreed at all, which was the first matter to be determined. Actually without such evidence the court does not have any basis for its finding as to the value of the building to the vendee and whether it was "an important part of the subject matter of the contract". Such a determination is a necessary prerequisite to granting or denying specific performance under the Massachusetts rule before the assessment of damages is reached. As the opinion stands, the adoption of the Massachusetts rule is more imaginary than real. The equitable conversion

theory is *applied,* not the Massachusetts rule.

The opinion simply awards the *proceeds* of the fire insurance policy. It does not, and could not on the evidence in the present record, ascertain the compensation or damages, if any, to which Skelly is entitled by reason of the destruction of the building. Evidence of this sort was excluded by the trial court. Count 2 of plaintiff's petition claims the insurance proceeds on the theory of a trust fund as a matter of law and that seems to be the basis of the majority opinion's award of the insurance fund to the purchaser. This is the antithesis of the Massachusetts rule which contemplates the ascertainment of the amount of compensation or damages that will assure the vendee receiving the value for which it contracted, and no more.

The statement about Mr. Busby, Skelly's negotiating and contracting agent, in the next to last paragraph of the opinion, overlooks the fact that Mr. Busby, as a witness, could testify as to his authority and the company's intention with respect to the lot. He undoubtedly knew more about this lot than the president of the company or its board of directors. Furthermore, the inference that a company of this size can only be bound by its "chief executive officers" or its board of directors is unsound. The agent has authority to bind the principal within the apparent scope of his authority.

Although the entire court now seems to be in agreement that the theory of equitable conversion should not be adopted and that the equitable rules which should govern are those that require an allowance of compensation or damages to fit the particular case, nevertheless a majority of the court have concurred in an opinion which makes the amount of insurance proceeds the yardstick. This is the rejected doctrine of equitable conversion regardless of the name given to it.

On the present record the plaintiff has failed to show a superior equity in the insurance proceeds under the Massachusetts rule or otherwise, and on well-established equitable principles I would leave the legal title to that fund where it is. I would find against the plaintiff on Count 2 of its petition, but award it specific performance under Count 1 on the condition that it pay to the defendants the agreed purchase price of $20,000 less the amount of compensation or damages, if any, that it could establish against the defendants (not the insurance funds) at a plenary hearing of that issue in the trial court.