**HOME SHOPPING CLUB, INC.,**
Plaintiff/Respondent,

v.

**ROBERTS BROADCASTING COMPANY,**
Defendant/Appellant.

No. 73196.

Missouri Court of Appeals,
Eastern District,
Division Two.

July 28, 1998.

Glenn E. Davis, Jordan B. Cherrick, Jennifer S. Lohman, Armstrong, Teasdale, Schlafly & Davis, St. Louis, for appellant.

Gerald P. Greiman, Daniel V. Conlisk, Francis X. Neuner, Jr., Dankenbring, Greiman, Osterholt & Hoffmann, P.C., St. Louis, for respondent.

CRANE, Presiding Judge.

Plaintiff Home Shopping Club (HSC), a broadcast network, brought an injunction action against defendant Roberts Broadcasting Company (Roberts), a broadcast television station, to enforce the parties' television affiliation agreement in which Roberts agreed to broadcast HSC programming during specified time periods. Roberts appeals from the judgment of the trial court permanently enjoining it from preempting HSC's broadcasts in the agreed time periods with any paid "infomercial" or commercial advertising programing until the affiliation agreement terminates on March 31, 2003. We affirm.

### FACTUAL BACKGROUND

· HSC is a broadcast network which markets goods and services through live televi-sion broadcasts twenty-four hours a day, seven days a week to affiliated broadcast television stations, cable television systems, and satellite dish receivers. Roberts is located in St. Louis, Missouri and operates FCC-licensed UHF broadcast television stations.

Roberts, as licensee of television station WHSL, Channel 46, in East St. Louis, Illinois, and HSC entered into a television affiliation agreement (the Agreement) on August 27, 1989. As amended, the Agreement continues through March 31, 2003. The Agreement recites that Roberts "has determined that the public interest, convenience and necessity would be served by its broadcast of the HSC PROGRAM SERVICE." It provides that Roberts will broadcast HSC programming at a set hourly rate during the following time periods:

Monday through Saturday: Midnight to 11:59 PM

Sundays: Midnight to 6:00 AM and 10:00 AM through 11:59 PM

The Agreement further provides that HSC will make available to Roberts five minutes per hour in which Roberts can broadcast local programming and commercials of its own choosing.

The Agreement provides that HSC will pay compensation for its programming as follows:

STATION compensation shall be $190 per hour for each hour HSC programming is carried. It is understood that HSC will compensate STATION only for those hours it airs HSC programming....

HSC reserves the right to evaluate and change at anytime STATION'S hourly compensation rate as set forth herein. Any increase in STATION'S compensation shall become effective on the date specified in HSC'S notice to STATION. Should HSC decrease STATION'S compensation below that set forth herein, HSC shall notify STATION in writing at least 90 days prior to the effective date of such reduction, but in any event, HSC shall not reduce STATION'S compensation below $182 per hour prior to March 31, 1998,

unless STATION is in breach of this Agreement.

In addition, the Agreement contains a "Right of Refusal" clause which gives Roberts the right to refuse any HSC programming that it "reasonably believes to be unsatisfactory or unsuitable or contrary to the public interest" or to substitute programming that it believes is of "greater local or national importance":

16. RIGHT OF REFUSAL. Nothing herein contained shall be construed to prevent or hinder STATION from rejecting or refusing such portions of the HSC PROGRAM SERVICE which STATION reasonably believes to be unsatisfactory or unsuitable or contrary to the public interest or substituting a program which in STATION'S opinion is of greater local or national importance. STATION shall provide HSC with prompt telegraphic notification of any such refusal, rejection or substitution.

The Right of Refusal clause is based on the FCC's "Right to Reject" Rule contained in 47 C.F.R. Section 73.658(e) which provides:

(e) Right to reject programs. No license shall be granted to a television broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization which, with respect to programs offered or already contracted for pursuant to an affiliation contract, prevents or hinders the station from:

(1) Rejecting or refusing network programs which the station reasonably believes to be unsatisfactory or unsuitable or contrary to the public interest, or

(2) Substituting a program which, in the station's opinion, is of greater local or national importance.

The Agreement also provides that, where applicable, federal, state and local law, including FCC rules and regulations, governs the contract.

Roberts has been the exclusive broadcast carrier of HSC programming in the St. Louis area since 1989. From 1989 through early 1996, Roberts broadcast HSC programming as set out in the Agreement.

In a letter dated May 4, 1996, Roberts unilaterally announced to HSC that it would "experiment with other programming" and undertake "a gradual reduction in [HSC] programming." The only reason given for this decision was that Roberts felt HSC had taken an action which breached the Agreement. During June of 1996, Roberts preempted approximately 150 hours of HSC programming. During July, August, and September, Roberts preempted approximately 167, 183, and 177 hours, respectively, of HSC programming. Other than the May 4 letter, Roberts has not given HSC any notice of preemptions and has never given telegraphic notification of any refusal, rejection or substitution as required by the agreement.

Roberts substituted paid "infomercials" for the HSC programs. Many of these were programs of approximately 30 minutes in length advertising various products or services for sale and soliciting viewers to call a toll-free number to make a purchase using a credit card. Examples included the Ab Sculptor, the Juice Man, George Foreman's Lean Mean Fat Grilling Machine, Prolong lubricants, Vanna White's Perfect Smile tooth whitening system, Viper Bite golf equipment, and the Ronco Food Dehydrator. Others were paid religious programming such as Jerry Falwell's The Old Time Gospel Hour and The Awakening Hour.

Roberts received broadcast fees of $500 to $1,100 per hour from broadcasting these paid "infomercials." Michael Roberts, Chairman and Chief Executive Officer of Roberts, testified that over a ten month period Roberts could generate an additional $400,000 to $1,000,000 by preempting HSC programming in favor of "infomercials." Michael Roberts testified that Roberts preempted some of the HSC programming because the HSC programming was redundant and it wanted to diversify its programming format. He testified that the "infomercials", which sold one product in a half hour time slot, sold products that were helpful to the community along with good advice or in-depth information about the product and services being offered. He specifically responded to the following questions as follows:

Q Can you tell us specifically which, if any, of [the factors in paragraph 16] you are relying on for the preemptions here?

A Well, I find that the redundancy of the program and monotony of the program had become unsatisfactory and I'd like to see—I felt that it would be in the best interest of our station to create some diversity and break the monotony.

Q So are you telling us you're relying on the "unsatisfactory" language?

A That's one. I also feel that the diversity of the programming is of greater local importance. I feel that it offers more in depth subject matter within an electronic retailing format environment.

HSC continued to pay Roberts the agreed $190 for each hour of HSC broadcast on WHSL. HSC did not reduce its payments to Roberts because of the preemptions. HSC contends that it could not calculate its alleged losses from preemption with any certainty.

### TRIAL COURT PROCEEDINGS

HSC filed a verified petition for injunctive relief in which it asked the trial court to enjoin Roberts from preempting HSC's programming. After preliminary and permanent injunction hearings, the trial court found that Roberts was breaching the agreement by preempting HSC programming in favor of more lucrative paid "infomercials" and commercial advertising programming without a reasonable belief that HSC's programming was unsatisfactory or that the substitute programming was of greater local or national importance. In its Findings of Fact the trial court specifically found:

14. As a matter of fact, defendant has not rejected plaintiff's programming because defendant "reasonably believes [it] to be unsatisfactory or unsuitable or contrary to the public interest," nor has defendant substituted programs which in defendant's opinion are of greater "local or national importance." Defendant has preempted plaintiff's programming solely for economic reasons. The Court rejects as not credible the testimony adduced by defendant suggesting that substitute programming was of special interest to viewers in the St. Louis area, or that defendant was motivated by the religious or cultural interests of its viewers in preempting plaintiff's programming.

It concluded that the Right of Refusal clause did not confer a right to reject for wholly economic reasons and in particular, did not give Roberts the right to seek out and substitute more lucrative "infomercials" and commercial advertising programming in lieu of HSC's programming. It permanently enjoined Roberts from:

broadcasting over station WHSL, Channel 46, any paid 'infomercial' or commercial advertising programming (defined as programming advertising or promoting the sale or purchase of property, goods, or services, or solicitation of contributions for any purpose, but excluding paid political announcements), other than that supplied by plaintiff Home Shopping Club, Inc., until March 31, 2003; provided, that defendant may substitute at any time any programming, other than 'infomercials' or paid commercial advertising programming as defined herein, which originates in St. Louis City or St. Louis County, Missouri, or East St. Louis, Illinois, or which pertains to religious, cultural, political or current events; and provided, further, that defendant shall be entitled to broadcast any programming of its choice for not more than 5 minutes per hour in accordance with paragraph 5 of the television affiliation agreement ... and from 6:00 a.m. to 10:00 a.m. on Sundays, pursuant to Schedule A of the television affiliation agreement ...

### DISCUSSION

On review of a judgment granting injunctive relief, as in any court tried case, we will sustain the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). This appeal challenges the trial court's conclusions of law. We independently evaluate those conclusions on appeal without deference to the trial

court. *Unlimited Equip. Lines v. Graphic Arts,* 889 S.W.2d 926, 932 (Mo.App.1994).

In its points on appeal, Roberts asserts that the trial court erred in issuing the injunction for three reasons. It claims: 1) that the right to reject rule incorporated in the Agreement gave it a right to preempt for any reason, including economic reasons, and its preemption of HSC programming does not therefore breach the Agreement; 2) that the trial court's interpretation of the right to reject rule in the Agreement to prohibit preemption for economic reasons violates the First Amendment; and 3) that, even if the Agreement was breached, injunctive relief is not appropriate because HSC has an adequate remedy at law. We take these in this order.

## A. *Right to Reject Rule*

■ Roberts argues that the Right to Reject Rule as incorporated into the Right of Refusal clause of the Agreement allows it to engage in preemption based on its "belief" and "opinions" about the programming and does not prohibit preemptions for purely economic reasons.

The Right to Reject Rule was adopted as a result of the FCC's Report on Chain Broadcasting[1] which found that right to reject clauses in the then-prevalent network affiliation clauses did not sufficiently protect the public interest. *National Broadcasting Co. v. U.S.,* 319 U.S. 190, 205, 63 S.Ct. 997, 1004, 87 L.Ed. 1344, 1357 (1943)(quoting FCC REP. ON CHAIN BROADCASTING 39 (1941)). The report emphasized that the station, not the network, is licensed to serve the public interest. *NBC,* 319 U.S. at 205, 63 S.Ct. at 1004 (quoting FCC REP. ON CHAIN BROADCASTING 66 (1941)). Further, the station cannot lawfully bind itself to accept programs in every case when it cannot sustain the burden of proof that it has a better program. *NBC,* 319 U.S. at 205–206, 63 S.Ct. at 1004–05 (quoting FCC REP. ON CHAIN BROADCASTING 66 (1941)). The station is obliged to reserve to itself the final decision as to what pro-

grams will best serve the public interest. *Id.* The report specifically stated:

'We conclude that a licensee is not fulfilling his obligations to operate in the public interest, and is not operating in accordance with the express requirements of the Communications Act, if he agrees to accept programs on any basis other than his own *reasonable* decision that the programs are satisfactory.'

*NBC,* 319 U.S. at 206, 63 S.Ct. at 1005 (quoting FCC REP. ON CHAIN BROADCASTING 66 (1941)). (Emphasis added).

The Supreme Court concluded that the "public interest" to be served under the Communications Act is the listening public's interest in "the larger and more effective use of radio." *NBC,* 319 U.S. at 216, 63 S.Ct. at 1009. "'An important element of public interest and convenience affecting the issue of a license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts.'" *Id.* (quoting *Federal Communications Comm. v. Sanders Bros. Radio Station,* 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869, 874 (1940)).

The licensee station has the responsibility to maintain and promote the public interest. For this reason the FCC makes the license dependent on the station not being a party to an affiliation contract which prevents or hinders it from exercising its right to reject. The Right to Reject Rule gives the licensee very broad discretion to reject programming, but not an absolute power to do so. As stated in the Report on Chain Broadcasting, the licensee must act on the basis of its "own reasonable decision." FCC REPORT ON CHAIN BROADCASTING 66 (1941). The Right to Reject Rule allows rejection of network programs which the station reasonably believes are unsatisfactory, unsuitable, or contrary to the public interest.

Because paragraph 16 of the Agreement makes a contract term of this language, it not only allows Roberts to reject portions of HSC programming when it "reasonably be-

---

1. FCC REPORT ON CHAIN BROADCASTING, Commission Order No. 37, Docket No. 5060 (May 1941), *modified,* Supplemental Report on Chain Broadcasting (October 1941), *appeal dismissed sub* *nom. NBC v. United States,* 47 F.Supp. 940 (S.D.N.Y.1942), *aff'd,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

lieves" the program is unsatisfactory, but it also obligates Roberts not to reject unless it so "reasonably believes." It is in the public interest to enforce contractual rights and obligations. *Willman v. Beheler,* 499 S.W.2d 770, 777 (Mo.1973). Because the parties exercised their freedom to contract within the confines of the FCC rule, their obligations under such a contract are entitled to enforcement. Roberts may not reject HSC programming for which it contracted without such a reasonable belief.

Under the Agreement Roberts may substitute a program which, in its opinion, "is of greater local, or national importance." Unlike the rejection provision, the word "reasonable" does not modify "opinion." However, we do not read the rule or the contract as imposing no conditions on the word "opinion."

■ Missouri law implies a covenant of good faith and fair dealing in every contract. *Acetylene Gas Co. v. Oliver,* 939 S.W.2d 404, 410 (Mo.App.1996); *Slone v. Purina Mills, Inc.,* 927 S.W.2d 358, 368 (Mo.App.1996); *Martin v. Prier Brass Mfg. Co.,* 710 S.W.2d 466, 473 (Mo.App.1986) (quoting RESTATEMENT (SECOND) OF CONTRACTS Section 205 (1981)). This duty prevents one party to the contract from exercising a judgment conferred by the express terms of the agreement in such a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract. *Acetylene Gas,* 939 S.W.2d at 410; *Martin,* 710 S.W.2d at 473 (citing 1A CORBIN ON CONTRACTS Section 165 (1963); Robert S. Summers, *The General Duty of Good Faith—Its Recognition and Conceptualization,* 67 CORNELL L. REV. 810, 821 et seq. (1982)). Thus, Roberts may not substitute programming based on an expressed "opinion" which is not made in good faith in order to substitute more lucrative programming. Here, the trial court found from the evidence that Roberts' substitution was based solely on economic reasons and the trial testimony that such programming was of greater local interest to viewers was not credible.

For us to hold otherwise, that Roberts had an absolute right to substitute more lucrative programming on the basis of an opinion without any good faith requirement, would make the parties' contract illusory, without mutuality of obligation, and unenforceable. *See Martin,* 710 S.W.2d at 473. We will not interpret this provision to give the licensee a right to substitute programming arbitrarily and deprive the contract of mutuality. *See Spitcaufsky v. State Highway Commission of Missouri,* 349 Mo. 117, 159 S.W.2d 647, 656 (1941).

Accordingly, the trial court did not err in determining that Roberts could not reject and substitute HSC programming for any reason.

### B. *First Amendment*

■ Roberts makes several arguments to the effect that the trial court, by entering the injunction, violated Roberts' free speech rights under the First Amendment. It first argues that the First Amendment does not permit any interpretation of the Right to Reject rule as incorporated in the Right of Refusal provision of the Agreement that gives the trial court unbridled discretion to determine the type of programming Roberts may substitute for HSC programming. Roberts also contends that the trial court's permanent injunction violates its First Amendment rights by showing a preference for HSC's programming which consists of commercial speech over Roberts programming which contains both commercial and noncommercial speech. In addition Roberts argues that the injunction fails to meet the Supreme Court test for a permissible regulation of either commercial or non-commercial speech.

In this case, the trial court is not vested with unbridled discretion to determine what type of programming Roberts may broadcast. Nor is the trial court charged with the task of reviewing the content and viewpoint of Roberts' programming prior to broadcasting. Further, the trial court's injunction does not need to be measured by the test for permissible regulation of commercial or noncommercial speech.

By its injunction the trial court is enforcing the parties' private affiliation agreement which already sets out the type of programming which Roberts, in its own discretion, has agreed to broadcast. The trial court's injunction is not an unconstitutional evalua-

**180** ▪

tion of the content and viewpoint of Roberts' programming. Rather, it requires Roberts to broadcast the type of programming which Roberts is contractually obligated to broadcast in the absence of a reasonable belief that the programming is unsatisfactory, unsuitable, or contrary to the public interest or a good faith opinion that the substituted programming is of greater local or national importance. HSC has a contractual right to the broadcasting of its network programming during the time periods set out in the Agreement. The trial court's protection of HSC's contractual rights by injunctive relief does not amount to unconstitutional government censorship. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979).

Having voluntarily entered the Agreement, Roberts bargained away any First Amendment claims preempted by the Agreement. It cannot invoke the First Amendment to regain rights it has contracted away. *Paragould Cablevision v. City of Paragould, Ark.,* 930 F.2d 1310, 1315 (8th Cir.1991), *cert. denied,* 502 U.S. 963, 112 S.Ct. 430, 116 L.Ed.2d 450 (1991). Given the public interest in preserving the ability of parties freely to enter contracts and to seek judicial enforcement thereof, any infringement by injunction on Roberts' First Amendment Rights is tolerable and justified. *Cherne Indus., Inc. v. Grounds & Associates,* 278 N.W.2d 81, 94 (Minn.1979). Roberts' First Amendment claim is not a defense to HSC's breach of contract claim or HSC's right to an injunction. *Barnstead Broad. Corp. v. Offshore Broad. Corp.,* 865 F.Supp. 2, 7 (D.D.C. 1994).

C. *Propriety of Injunctive Relief*

▪ Roberts finally contends that, even if it did breach the Agreement by preempting HSC's programming, HSC had an adequate legal remedy because it could reduce its payments under Schedule B of the Agreement and bring an action for breach of contract. Roberts argues that the Agreement contemplated ongoing preemptions and provided for such preemptions by allowing HSC to reduce its hourly payments to Roberts. Roberts further argues that HSC's right to reduce the hourly rate below $182 in the event of breach represents a liquidated damage provision.

▪ An injunction may issue to prevent the doing of any legal wrong whenever, in the opinion of the court, an adequate remedy cannot be afforded by an action for damages. *Smith v. Western Electric Co.,* 643 S.W.2d 10, 13 (Mo.App.1982); *Eberle v. State,* 779 S.W.2d 302, 304 (Mo.App.1989).

In its Findings of Fact and Conclusions of Law, the trial court found:

19. Defendant has, as a matter of fact, breached the television affiliation agreement in a material way. The injury to plaintiff in the future will be irreparable. If plaintiff is in the business of hawking merchandise to St. Louis television viewers 24 hours a day, and is suddenly cut out of 3 or 4 of those hours, it is inevitable that there will be a loss of customers. It is likewise ineluctable that these losses, particularly the losses to be apprehended from potential changes in viewer habits, are so difficult to quantify that an award of damages will not be adequate. The record here indicates that some people actually resent the disappearance of plaintiff's broadcasts, and this is the sort of thing that any retailer would dread.

▪ We disagree that the Agreement suggests that the parties contemplated ongoing preemptions and provided an exclusive damage remedy for such ongoing breaches. The remedy at law for damages and the remedy in equity for specific performance are not exclusive of each other, but are cumulative where the remedy at law is inadequate. *Wills v. Forester,* 140 Mo.App. 321, 124 S.W. 1090, 1093 (1910); *State ex rel. Schoenbacher v. Kelly,* 408 S.W.2d 383, 391–92 (Mo.App.1966). Whether a liquidated damages provision forecloses equitable relief is determined by examining the real intention of the parties to be deduced from the whole instrument and the surrounding circumstances. *Wills,* 124 S.W. at 1093; *Schoenbacher,* 408 S.W.2d at 391–92. If it appears that the performance of the contract was intended, and not merely the payment of damages in case of its breach, the agreement will then be enforced by equitable relief. *Wills,* 124 S.W. at 1093; *Schoenbacher,* 408 S.W.2d at 391–92.

In this case, it is clear from the Agreement itself and the surrounding circumstances that

the parties intended that Roberts perform under the contract until the end of its term and not only that HSC be entitled to reduce the hourly rate in the event of breach. Where it is likely that one party will repeatedly breach a long-term contract, an injunction is an appropriate remedy. *State ex rel. Missouri Highway v. Marcum Oil Co.,* 697 S.W.2d 580, 581–82 (Mo.App.1985); *Maryland Estates Homeowners' v. Puckett,* 936 S.W.2d 218, 219 (Mo.App.1996). Here, because the Agreement does not terminate until March 31, 2003 and because it is likely that Roberts would continue to preempt HSC programming, money damages would be an inadequate remedy for the irreparable harm which HSC may continue to suffer. Furthermore, HSC would be forced to bring suit for breach of contract each and every time that Roberts preempted its programming for purely economic reasons. *See Finley v. St. John's Mercy Medical Center,* 958 S.W.2d 593, 596 (Mo.App.1998). For these reasons, the trial court did not err in ordering an injunction.

All of Roberts' points are denied. The judgment of the trial court is affirmed.

GRIMM and RHODES RUSSELL, JJ., concur.