**Richard RIDDLE, Personal Representative of the Estate of Stella M. RIDDLE, Plaintiff–Appellant,**

v.

**ELK CREEK SALERS, LTD., Defendant–Respondent.**

No. 23892.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 22, 2001.

J. Michael Murphy and Mark J. Murphy, The Murphy Law Firm, Liberty, Attorneys for Appellant.

Kevin Checkett, Checkett & Pauly, P.C., Carthage, Attorney for Respondent.

GARRISON, Judge

Richard Riddle ("Appellant"), the personal representative of the estate of Stella M. Riddle ("Mrs. Riddle"), appeals from a judgment entered following a non-jury trial that granted Elk Creek Salers, Ltd. ("Respondent") an abatement of $20,000 on the purchase price of real estate.

On April 1, 1994, Mrs. Riddle entered into a three-year lease agreement with Respondent to lease it approximately 237 acres in Lawrence County. The lease allowed Respondent the option of extending the lease for periods of one year at a time "until such time as the farm [could] be sold." Respondent had the right to remove and destroy any improvements on the property, excluding the farmhouse and the barn. The lease agreement also gave Mrs. Riddle and her immediate family the right to use the farmhouse and the garden located on the property until her death. Respondent was generally charged with the duty to protect the real estate and accepted the property "as is." Under the agreement, Respondent also had a two-year option to purchase the property after Mrs. Riddle's death for $115,000.

Mrs. Riddle continued to reside in the farmhouse until her death on April 30, 1997. Following Mrs. Riddle's death, Respondent demanded possession of the premises. However, Mrs. Riddle's family continued to live in the home for a few months. The house caught fire and was completely destroyed the night the Riddle family moved out in June 1997. On March 8, 1999, nearly two years after the fire, Respondent notified Appellant that it intended to exercise the option to purchase the leased premises. In exercising the option, Respondent said: "This letter shall serve as notice of Elk Creek Salers' exercise of the option to purchase the real estate for the sum of $115,000." No mention was made of any reductions for the loss of the house. Appellant refused to proceed with the sale.

Appellant brought suit against Respondent for unpaid rent and for damage due to waste. Respondent filed a counterclaim for specific performance of the option to purchase the premises, which was later amended to include a request for a $25,000 credit for the farmhouse that was destroyed by fire. On June 5, 2000, the trial court rendered judgment in favor of Respondent on all issues, and ordered Appellant to convey the real estate in question to Respondent. In that judgment, the tri-

al court ordered that Respondent be given an abatement of $20,000 on the contracted purchase price of $115,000 for the farmhouse that was destroyed by fire. In that regard, it found that "[w]hile the [Appellant] was in possession the residence burned and was destroyed. The [Appellant] did not insure the residence."

The standard for our review of this action is set forth in Rule 84.13(d).[1] In reviewing the judgment, this Court views the evidence and permissible inferences drawn therefrom in the light most favorable to the judgment, and will affirm the judgment unless it is against the weight of the evidence, there is insufficient evidence to support it, or it erroneously declares or applies the law. *Ridgway v. TTnT Dev. Corp.*, 26 S.W.3d 428, 430 (Mo.App. S.D. 2000).

In his sole point on appeal, Appellant argues that the trial court erred in granting Respondent specific performance with an abatement of $20,000 in the purchase price due to fire damage.[2] He contends that Respondent was not entitled to an abatement because Respondent did not exercise its option to purchase until almost two years after the damage occurred.

If the holder of an option exercises that option, and *thereafter*, a portion of the premises is destroyed, the holder of the option may petition the court for an abatement in the contract purchase price. For instance, in *McBee v. Vandecnocke Revocable Trust*, 986 S.W.2d 170, 171 (Mo. banc 1999), the buyer timely exercised its option to purchase, but prior to closing, a building on the premises was destroyed by fire. In deciding the case, the court followed the "Massachusetts Rule," first adopted by Missouri in *Skelly Oil Co. v. Ashmore*, 365 S.W.2d 582, 589 (Mo. banc 1963). *McBee*, 986 S.W.2d at 174. The "Massachusetts Rule" states that, absent any agreement to the contrary, the risk of loss is placed on the seller during the executory period of the contract. *Skelly Oil*, 365 S.W.2d at 589.[3] Even though closing has not taken place, equitable conversion treats the seller as trustee of the property held for the buyer. *Id.* The *McBee* court, therefore, granted the buyer specific performance with an abatement in the purchase price for the value of the insurance proceeds collected after the fire. 986 S.W.2d at 174.

In the instant case, however, the "Massachusetts Rule" is inapplicable. Here, the farmhouse was destroyed nearly two years *before* Respondent exercised its option to purchase. The farmhouse was not destroyed during the executory period of any contract because no contract for the purchase of the property existed between Appellant and Respondent *until* Respondent exercised its option. This is because an option is merely a continuing and irrevocable offer that the seller cannot withdraw during a stated period. *HGS Homes v. Kelly Residential Group*, 948 S.W.2d 251, 255 (Mo.App. E.D.1997).[4] The option vests the buyer with a power of acceptance and, when the buyer accepts the offer in

---

1. All rule references are to Missouri Rules of Civil Procedure (2001), unless otherwise indicated.

2. Appellant does not raise as an issue on appeal the trial court's denial of his claims for damage due to waste and for unpaid rent.

3. The dissent applies language from *Skelly* to this case. In that case, however, there was an executory contract in existence when the loss occurred. That is inapposite to the facts here.

4. *Hahn v. Earth City Corp.*, 625 S.W.2d 640 (Mo.App. E.D.1981), cited in the dissent describes the two types of option contracts, but there the court found that no option contract existed.

the prescribed manner, the option is deemed to have been exercised so as to create a binding bilateral contract. *Id.* The bilateral contract is specifically enforceable. *Id.* However, until the buyer accepts, there is no enforceable contract. *Id.* This distinction was recognized in *Skelly Oil,* where the court noted:

> This purchaser's claims are founded on the contract of sale in its letter of March 4, 1958, and the option therein referred to, which letter was 'acknowledged and agreed to' by the vendors. Said claims are not based on a mere option to purchase where the improvements on the property were damaged *prior to* the purchaser's exercise of the option.

365 S.W.2d at 586 (emphasis added).

Courts in other jurisdictions have also addressed this issue and found that a buyer obtains no interest in the property merely because a seller has made an offer. *See Gamble v. Garlock,* 116 Minn. 59, 133 N.W. 175, 176 (1911) (Minnesota Supreme Court stated that an option confers no interest in the land, and refused to grant specific performance with an abatement in the stipulated price equal to the lost improvements in favor of a buyer-lessor who

attempted to exercise the option after the residence was destroyed by fire); *Caldwell v. Frazier,* 65 Kan. 24, 68 P. 1076, 1076–77 (1902) (Kansas Supreme Court held that an option contract is nothing more than a continuing offer to sell and conveys no estate or interest in the property, and refused to grant specific performance with an abatement in favor of a buyer-lessor who exercised his option after the mill was destroyed by fire); *Clark v. Burr,* 85 Wis. 649, 55 N.W. 401, 403 (1893) (Wisconsin Supreme Court refused to enforce an option contract with an abatement in the amount of the insurance proceeds where the mill was destroyed prior to the buyer exercising his option).[5]

■ Here, the option contained no language providing an adjustment of the purchase price in the event of damage or destruction of the improvements. Respondent acquired no interest in Appellant's real property, or any building thereon, *until* Respondent exercised its option to purchase on March 8, 1999. By then, the farmhouse had been gone for almost two years. When it exercised the option, it acknowledged that it was exercising the option to purchase the property at the full

---

5. The dissent cites *McCowen v. Pew,* 18 Cal. App. 302, 123 P. 191 (1912). That case involved facts disparate from those here. There, during the life of the option contract, plaintiff cut and removed timber from the property. With knowledge of the acts, defendant, in exercising the option, referred to the destruction and removal of the timber, and demanded compensation for it. That demand was acquiesced in by plaintiffs and the case proceeded to litigation when the parties could not agree on the compensation to be deducted from the sale price. In *McCowen,* the court affirmed a judgment for the defendant on three basis: the defendant demanded compensation for the destruction of the timber upon exercising the option; plaintiff "acquiesced in the acceptance and treated and recognized said acceptance as of the precise option which they had granted to the defendant, and thus they waived any objection to the acceptance upon the ground that it varied from the terms of the option"; and the changed conditions of the property was "due entirely and solely to the deliberate and unauthorized acts of the plaintiffs themselves during the life of the option ..." *Id.* at 199. In the instant case, Respondent exercised the option at the full contract price, knowing of the loss of the house, without requesting an abatement or deduction. Additionally, no issue was drawn, and the trial court made no findings of intentional destruction of the house by Appellant. The trial court merely found that "while [Appellant] was in possession the residence burned and was destroyed." There was no determination about whether the loss was intentional and, if so, who caused it. We cannot defer to factual determination never made by the trial court.

option price. Respondent is not entitled to an abatement for the destruction of property in which it never had any interest. Therefore, the trial court erred in ordering an abatement of $20,000 in the $115,000 sale price of the property.

The judgment of the trial court is reversed, and the case is remanded. On remand, the trial court is directed to delete any reference in the judgment to the $20,000 abatement, and to enter a judgment for Respondent on its claim for specific performance at the net sale price of $116,758.[6]

PREWITT, J., concurred.

RAHMEYER, J., dissented in separate opinion.

RAHMEYER, Judge

I respectfully dissent. In the context of this case, I disagree with the conclusion that Respondent can not receive an abatement as damages in addition to specific performance on the contract. The principal opinion finds the Massachusetts Rule to be inapplicable because the "farmhouse was not destroyed during the executory period of any contract because no contract existed between Appellant and Respondent *until* Respondent exercised its option." That does not end the analysis, however. Once a binding contract was found to be enforceable, the issue is what remedies are available to the buyer.

Respondent possessed a lease with an option contract concerning land and a farmhouse.

As with any contract, an option contract may be either unilateral or bilateral. 1A Corbin, *Contracts* § 260 (1963). In a unilateral option contract, the optionee pays the optionor to keep an offer

open for a stated period of time. The optionee makes no promise of any kind. The consideration is the performance by the optionee; i.e., the optionee's payment of money. The optionee is privileged to accept the offer or not. The optionor's promise is binding, however, because he has been paid to keep his offer open. 1A Corbin, *Contracts* § 260 (1963). In a bilateral option contract, the optionee pays for his option not by performance but with a promise.... Again, the optionee is privileged to accept the optionor's promise or not, but, in this instance, he has made a binding promise as consideration to have the offer kept open. The option contract is, thus, bilateral because each party has made a binding promise.

*Hahn v. Earth City Corporation,* 625 S.W.2d 640, 642 (Mo.App. E.D.1981).

Here there was consideration for the option contract. Respondent improved the land during the option (and lease) period. That he had the right to do so appears to be part of his lease agreement. "[W]here the option is incorporated into a larger real estate contract or lease, the mutual considerations supporting the entire contract or lease support the option provision." *HGS Homes, Inc. v. Kelly Residential Group, Inc.,* 948 S.W.2d 251, 255 (Mo. App. E.D.1997). Because there was consideration, the offer to sell the property to Respondent was an irrevocable offer. *I.R. Kirk Farms, Inc. v. Pointer,* 897 S.W.2d 183, 185 (Mo.App. W.D.1995).

An option contract is an enforceable promise not to revoke an offer. It is a continuing offer or agreement to keep an offer open and irrevocable for a specified period. It is a contract right, and the optionor must keep the offer open. Until an option is exercised, the optionor

---

**6.** The net sale price of $116,758 includes the $115,000 sale price of the property plus $1,758 for repayment for a perimeter fence. On appeal, the $1,758 was not contested.

has the duty not to revoke the offer during the life of the option.

17 C.J.S. *Contracts* § 55 (1999). The purpose of an option contract "is to bind the owner of the land, for valuable consideration, not to withdraw the offer for sale during the fixed period." *Wilson v. Edwards,* 560 S.W.2d 608, 612 (Mo.App.1978). To allow the owner to change the nature of the property being sold during the option period seems incompatible with this purpose. "The optionee may, but need not, exercise the option; if he or she does, each party must perform its obligations under the resulting bilateral contract." 17 C.J.S. *Contracts* § 55 (1999).

"Missouri law implies a covenant of good faith and fair dealing in every contract.... This duty prevents one party to the contract from exercising a judgment conferred by the express terms of the agreement in such a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract." *Home Shopping Club, Inc. v. Roberts Broadcasting Company,* 989 S.W.2d 174, 179 (Mo.App. E.D.1998). Here, the trial court that heard the witnesses found that Appellant wrongfully refused and still refuses to perform his portion of the contract. In fact, in the same paragraph in the contract where Lessee (Respondent) agreed to take the property "as is," the contract states that the Lessee had fully inspected the premises and "agrees to take same in its current condition." The court further found that while Appellant was in possession of the farmhouse, it was burned and destroyed. Appellant was very clear in his testimony that he thought his mother had struck a bad bargain and that he was not in favor of it. The court found that Respondent will receive less than the benefit of his bargain for the reason that the residence was destroyed. These were factual determinations by the trial court to which we must defer. *See Amyx v. Col-*

*lins,* 914 S.W.2d 370, 373 (Mo.App. S.D. 1996). Substantial evidence supported the court's findings.

By granting specific performance, the court recognized the contract for the sale of the land and farmhouse existed between Appellant and Respondent. To set the abatement amount, the court used Appellant's value for the farmhouse that was destroyed while in Appellant's possession. To allow Appellant to retain possession of the premises after demand was made upon him to quit the premises and then to allow the destruction of the property that was the subject of the option contract to be destroyed with no consequence to Appellant relieves Appellant of his obligation to keep the offer open to sell the land and the farmhouse in the condition as of the date of the making of the option.

There is a dearth of case law addressing this precise situation, wherein part of the subject of the option contract is destroyed prior to the exercise of the option and the optionee then accepts the option with a request for specific performance and damages for the loss; however, *McCowen v. Pew,* 18 Cal.App. 302, 123 P. 191 (1912), addresses a similar circumstance. McCowen (along with other individuals irrelevant for our purposes) granted to Pew an option to purchase 1,160 acres for $15 per acre within the next twelve months. Prior to the expiration of the option period, and without Pew's consent or knowledge, McCowen cut and removed large quantities of timber from ten acres of the land. Pew later learned of the timber being removed. He then elected to exercise his option and pay for the land at the rate specified in the contract, less the loss in value of the land resulting from the removal of the timber. The parties could not agree on a value of the timber re-

moved and the lawsuit ensued. *McCowen*, 123 P. at 192.

On appeal McCowen alleged Pew stated no cause of action. Finding otherwise, the appellate court analyzed whether Pew was entitled to a reduction in price as a result of McCowen's removal of the timber. The court framed the issue, in part, as follows:

> Up to this point, it would and could not be doubted that a court of equity would compel specific performance on the part of either of the parties to this contract. But it transpires that the plaintiffs—the owners of the lands and the optioners [sic]—through their own deliberate and unauthorized acts, find themselves unable to perform their agreement in full. By their own acts during the life of the option they have lessened the value of the lands which they agreed to allow the defendant to buy at a specified price.

*Id.* at 198. The court continued:

> The rule is thus stated by Prof. Pomeroy, in his work on Equity Jurisprudence (volume 6, § 831): "Where the vendor is unable even substantially to perform his contract, the vendee, at his election, may have specific performance with compensation for the deficiency, on the principle that 'where one party would be foiled at law, but the other may have the reasonable, substantial effect of his contract, compensation shall be admitted.' "
>
> . . . .
>
> [A] party will not be permitted arbitrarily, or at his own will, or by his own acts, or without the consent of the other party thereto, to render his contract nugatory. An option agreement, although in its nature unilateral, is as binding upon the part of the optioner [sic] as is a bilateral agreement upon the parties thereto. So long as it is supported by a consideration, the optioner [sic] can no more capriciously withdraw or rescind it than one of the parties could arbitrarily or without the consent of the other party rescind a bilateral contract.

*Id.* at 199. I agree with this reasoning and believe it should be applied to the case before us.

"[W]hen a court of equity once acquires jurisdiction it may retain it to do full and complete justice even though it involves adjudicating matters of law or rendering a money judgment, particularly where there is a general prayer for relief or a prayer for both types of relief." *Metropolitan St. Louis Sewer District v. Zykan*, 495 S.W.2d 643, 658 (Mo.1973). An equity court has broad powers. "[The court] can do complete justice; require an accounting; establish and enforce vendor's or other liens on terms provided in the contract; adjust equities for improvements made, deterioration, rent, interest and the like...." *McDermott v. Burpo*, 663 S.W.2d 256, 263 (Mo.App. W.D.1983).

To accept the reasoning of the primary opinion is to rule as a matter of law that the holder of an option contract is not entitled to the contract for which he bargained. The subject matter of the option contract may be destroyed at any time without any punishment, penalty, or recourse to the seller. Respondent's option contract would be a second-class type of contract. I cannot concur in such a holding.

I find the reasoning in *Skelly Oil Company v. Ashmore*, 365 S.W.2d 582 (Mo. banc 1963), persuasive when the court discussed the reason for allowing the buyers to apply the insurance proceeds to the purchase price when the building on the property was destroyed by fire in the executory contract:

> We see no inequity to defendants in such enforcement since they will receive the full amount ($20,000.00) for which they contracted to sell the property....

The short of the matter is that defendants will get all they bargained for; but without the building or its value plaintiff will not.

*Id.* at 589–90. I would, therefore, affirm the judgment of the trial court.