

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD81099 |
| | ) | |
| LONNIE VANDELL MITCHELL, | ) | FILED: April 30, 2019 |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County**
**The Honorable Sandra Midkiff, Judge**

**Before Division Two: Edward R. Ardini, Jr., P.J., and**
**Alok Ahuja and Gary D. Witt, JJ.**

After a jury trial in the Circuit Court of Jackson County, Lonnie Mitchell was found guilty of property damage in the first degree, in violation of § 569.100,[1] and animal abuse, in violation of § 578.012. The charges stemmed from an incident in which Mitchell damaged a home that he rented together with his girlfriend and her four children, as well as personal property belonging to Girlfriend[2] and her children. Mitchell appeals, challenging only his conviction for first-degree property damage. He argues that the circuit court erred by failing to instruct the jury that it had to find that Mitchell did not act under a "claim of right." Because we conclude that Mitchell did not present sufficient evidence to inject the claim of right issue into the case, we affirm.

---

[1] Unless otherwise indicated, all statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, updated through the 2015 noncumulative supplement.

[2] We refer to Mitchell's victim using the generic term "Girlfriend" in order to protect her privacy. *See* § 595.226.1, RSMo 2016.

## Factual Background[3]

In 2016, Mitchell and Girlfriend had been in a romantic relationship for eight years. Girlfriend had four children; Mitchell was the father of the youngest two.

On June 3, 2016, Girlfriend and Mitchell entered into a Residential Lease with Option to Purchase Agreement for a house at 5509 Woodland Avenue in Kansas City. The Agreement provided that Mitchell and Girlfriend would lease the house for a term of 60 months and 28 days, with a monthly rental of $450.00. The Agreement included an option for Girlfriend and Mitchell to purchase the house for $34,900. Girlfriend and Mitchell paid $750.00 as consideration for the purchase option.

The home's lessor had acquired the property in foreclosure, and it was not in habitable condition at the time Girlfriend and Mitchell entered into the Lease Agreement. As part of the Agreement, Girlfriend and Mitchell were required to bring the house into habitable condition within ninety days of taking possession. Girlfriend installed plumbing, a hot water heater, kitchen appliances, and a bathroom sink. Girlfriend paid for the fixtures and did most of the work installing them, but Mitchell provided some assistance. After the new appliances and fixtures were installed and in working order, Girlfriend and her four children moved into the house. They brought their personal property into the house, including clothing, furniture, and televisions and other electronics. Mitchell also stayed at the house, and maintained some personal property at the house, although he also had another residence.

On the morning of June 30, 2016, Mitchell woke Girlfriend and accused her of cheating on him. After arguing with Mitchell for thirty minutes, Girlfriend left the house with her children, and went to her mother's house. While at her mother's

---

[3]     Because Mitchell does not challenge his conviction for animal abuse in this appeal, we have omitted the facts relevant only to that offense.

2

house, Girlfriend received a text message from Mitchell stating that they "didn't have a house" and that they had lost the house.

When Girlfriend returned to the house later that afternoon, she found that the front door's locking mechanism was destroyed. In the front room, the screen of a big-screen television was smashed, a glass coffee table was shattered, and a DVD player had been thrown across the room. Girlfriend's clothes were scattered around the front room, covered in motor oil.

In the children's room, the bed was cut open and a DVD player had been used to smash the screen of a television. The door to the children's room had been ripped off of its hinges. In Girlfriend's bedroom the mattress had been shredded, and a small refrigerator destroyed. Both rooms had gouges in the walls. The bathroom sink was shattered and the toilet was ripped out of the floor and broken into pieces.

In the kitchen, the table and stools had holes in them. The front of the stove had been broken, along with a coffee maker. In the basement, the water heater had been punctured and the plumbing lines cut down. One of the furnace vents had also been cut. Throughout the house, rocks had been thrown through twelve double-paned windows.

Girlfriend testified that, up to the date of trial, she had spent approximately $2,500 repairing and replacing damaged property.

On July 2, 2016, a detective interviewed Mitchell. During the interview, he admitted to damaging the property. He stated that he and Girlfriend had purchased the house together, and that the property in the house which he damaged was his. Before trial Mitchell wrote a letter to the judge, which similarly claimed that he and Girlfriend were purchasing the house, and that he was on a mortgage for the house.

Mitchell was charged with property damage in the first degree and animal abuse. At trial, Mitchell requested that the jury be instructed on the property-

damage charge that it had to find that he did not act under the reasonable belief that he had the right to damage the home and its contents. The court refused to instruct on the claim of right issue, because § 569.130.3 prohibits a tenant from asserting a claim of right with respect to damage to leased property.

The jury found Mitchell guilty of property damage in the first degree and animal abuse. The circuit court sentenced him to consecutive sentences of four years' imprisonment for each offense.

Mitchell appeals.

**Analysis**

In his sole Point on appeal, Mitchell argues that he sufficiently injected the issue of claim of right at trial, and that the circuit court accordingly erred by refusing to include language concerning the claim of right issue in the verdict director for the property damage offense.

> In determining whether a defendant is entitled to an instruction refused by the trial court, we review the evidence in the light most favorable to the defendant. Generally, the defendant is entitled to any instruction supported by the evidence.

*State v. McPike*, 514 S.W.3d 86, 88 (Mo. App. E.D. 2017) (citations omitted); *see also, e.g.*, *State v. Umbertino*, 489 S.W.3d 855, 858 (Mo. App. E.D. 2016).

Section 569.100 provides that "[a] person commits the crime of property damage in the first degree if such person . . . [k]nowingly damages property of another to an extent exceeding seven hundred fifty dollars." Section 569.130.1 provides that "[a] person does not commit an offense by damaging . . . property of another if he or she does so under a claim of right and has reasonable grounds to believe he or she has such a right." *See State v. Green*, 643 S.W.2d 1, 2 (Mo. App. E.D. 1982).

The burden of injecting the issue of a claim of right is on the defendant. § 569.130.2.

> The Missouri property damage statute allocates to defendants the single burden of coming forward with some evidence concerning a reasonable explanation for their conduct, i.e. a reasonably held claim of right. Once the defendant produces such evidence, the state retains the burden of persuading the trier of fact beyond a reasonable doubt that no such right existed.

*Green*, 643 S.W.2d at 2; *see also* MAI-CR3d 323.70, Note on Use 3 (describing the required modification of the verdict director for first-degree property damage where the defendant has presented evidence sufficient to inject the claim of right issue into a case); MAI-CR3d 323.72, Note on Use 3 (same for second-degree property damage).

> This issue is not submitted to the trier of fact, however, unless it is supported by evidence. To support the submission of an instruction on a claim of right, "it was not sufficient that defendant believed that he had a right . . . . Evidence of reasonable grounds for that belief was also required."

*State v. Lynch*, 356 S.W.3d 810, 812 (Mo. App. S.D. 2012) (quoting *State v. Cox*, 741 S.W.2d 74, 77 (Mo. App. S.D. 1987)).

Because a defendant must present evidence not only of his *subjective belief* of a right to damage property, but also of *reasonable grounds* for that belief, "[t]he burden [of injecting the claim of right issue] is not met by self-serving statements of the defendant." *State v. Eidson*, 701 S.W.2d 549, 552 (Mo. App. E.D. 1985) (citations omitted). "'The naked assertion of an honest belief in a legal right, unsupported by any evidence of facts or circumstances from which such a belief might reasonably be inferred, is insufficient to raise the issue.'" *State v. Umbertino*, 489 S.W.3d 855, 858 (Mo. App. E.D. 2016) (quoting *State v. Smith*, 684 S.W.2d 576, 580 (Mo. App. S.D. 1984)).

Mitchell contends that he adequately injected the claim of right issue in this case, "because a reasonable juror could have found from the evidence that Mr. Mitchell acted under the reasonable belief that he owned the real property and the items inside." He relies on the Residential Lease with Option to Purchase

5

Agreement to establish reasonable grounds for his belief that he owned the property he damaged, and therefore had the right to deal with that property as he chose.

As an initial matter, the Lease Agreement affords Mitchell no ownership rights with respect to the personal property of Girlfriend and her children—including clothing—which he damaged. Mitchell has identified no basis for a reasonable belief that he had the right to damage that personal property.

The Lease Agreement does not grant Mitchell an ownership interest in the real property, either. The Lease Agreement is just that—an agreement to _lease_ real property belonging to another, for a specified term, for a specified rental. The Agreement repeatedly refers to itself as a "lease," repeatedly refers to the obligation of Mitchell and Girlfriend to pay "rent," and repeatedly refers to the parties as "Lessor" and "Lessee" or "Landlord" and "Tenant." The Lease Agreement specifies that part of Mitchell and Girlfriend's monthly rental payment would be used to purchase "Renter's Insurance." The Agreement gives the Lessor the right to "evict" Mitchell and Girlfriend from the premises if they default in their payment of rent. The Lease Agreement also specifically prohibits Mitchell and Girlfriend from causing any permanent damage to the leased property: it states that "LESSEE(s) shall maintain the Premises and will not cause or permit any waste or damage other than normal wear and tear."

In 2014, the General Assembly amended § 569.130 by adding subsection (3), which specifies that "[n]o person who, as a tenant, willfully or wantonly destroys, defaces, damages, impairs, or removes any part of a leased structure or dwelling unit, or the facilities, equipment, or appurtenances thereof, may inject the issue of claim of right." § 569.130.3. Under the unambiguous provisions of the Lease Agreement to which he was a party, Mitchell was a tenant in the premises he damaged, and was therefore prohibited by § 569.130.3 from asserting a claim of right.

6

Mitchell argues that he had a reasonable belief that he was purchasing, and therefore owned, the leased premises, by virtue of the option to purchase that was granted to Mitchell and Girlfriend in the Lease Agreement. We disagree. The Lease Agreement clearly provides that Mitchell and Girlfriend merely had an *option* to purchase the leased premises, which they could choose to exercise by taking *further action* beyond merely maintaining the property, and paying rent. The Agreement did not itself constitute a purchase contract, however, and it clearly did not give Mitchell an ownership interest in the property. The Agreement provided that the purchase price of the home was $34,900.00. The Agreement provided that, of the $450.00 monthly rental, "SIXTY DOLLARS AND NO CENTS ($60.00) . . . shall be credited toward the purchase price of the premises . . ., and shall be considered as non-refundable escrow towards the PURCHASE PRICE."

Although part of the Mitchell and Girlfriend's monthly payments was deemed to be an "escrow" against the purchase price, the Agreement made clear that Mitchell and Girlfriend would have to "choose to exercise their rights to purchase" before the lease term expired. The Agreement specified three alternatives from which Mitchell and Girlfriend could choose at the conclusion of the lease term. First, they would have the "option to convert to seller financing," at the conclusion of the lease term (or at an earlier time, if they had paid at least 30% of the purchase price). The Agreement provided that "[t]his conversion shall be documented by a separate instrument." The Lessor agreed in the Lease Agreement that, if Mitchell and Girlfriend were unable to secure conventional financing at the conclusion of the lease term, the Lessor would provide twenty-five-year financing at an 11.75% annual interest rate.

Second, the Agreement provided that, at any time during the lease term, Mitchell and Girlfriend could tender the outstanding balance of the purchase price

7

in a "cash sale." As with the seller-financing option, the Agreement provided that "[t]his CASH SALE shall be documented by a separate instrument."

Finally, the Agreement gave Mitchell and Girlfriend the option to "choose to forfeit their rights to the premises described herein and vacate the premises and all appurtenances within FIVE (5) days of the determined expiration of the agreement." If Mitchell and Girlfriend failed to vacate the premises within five days, the Agreement provided that "LESSOR shall have the right to evict LESSEE(s) according to the proper judicial process." Significantly, the Agreement also provided that Mitchell and Girlfriend would be responsible for damage to the property if they chose to vacate the premises:

> LESSEE(s) agree that upon the execution of OPTION 3 (above), LESSEE(s) shall vacate premises in the same condition or better as of the execution of this agreement. LESSEE(s) acknowledge that should they vacate the premises in worse condition than at the time of execution of this agreement, any and all appropriate legal action may be sought by LESSOR for restitution including but not limited to the recovery of all actual legal fees incurred by the LESSOR.

The mere fact that Mitchell and Girlfriend possessed an option to purchase the damaged property—if they took certain additional actions in the future—did not make them owners of that property, or give them legally enforceable rights with respect to that property.

> [A]n option is merely a continuing and irrevocable offer that the seller cannot withdraw during a stated period. The option vests the buyer with a power of acceptance and, when the buyer accepts the offer in the prescribed manner, the option is deemed to have been exercised so as to create a binding bilateral contract. The bilateral contract is specifically enforceable. However, until the buyer accepts, there is no enforceable contract.

*Riddle, ex rel. Riddle v. Elk Creek Salers, Ltd.*, 52 S.W.3d 644, 646–47 (Mo. App. S.D. 2001) (footnote omitted) (citing *HGS Homes v. Kelly Residential Grp.*, 948 S.W.2d 251, 255 (Mo. App. E.D. 1997)); *see also Hendricks v. Northcutt*, 820 S.W.2d 689, 692 (Mo. App. S.D. 1991). "Acceptance of an option cannot be made in some

8

manner contrary to the method provided in the agreement. Rather, an optionee must exercise the option in strict accordance with its expressly stated terms and conditions." *Deal v. Consumers Programs, Inc.*, 470 F.3d 1225, 1232 (8th Cir. 2006) (Missouri law; citations and internal quotation marks omitted).

Until they actually *exercised* the purchase option in the manner specified in the Agreement, Mitchell and Girlfriend acquired no ownership rights in the property. In *Riddle*, 52 S.W.3d 644, the Southern District addressed the financial consequences of damage to real property which is subject to a purchase option. The Court recognized that, *after* an option is exercised, the option-holder is entitled to abatement of a portion of the purchase price due to property damage. *Id.* at 646. Such a price reduction is allowed on the theory that, once the option is exercised, the option-holder acquires beneficial ownership rights in the property: "[e]ven though closing has not taken place, equitable conversion treats the seller as trustee of the property held for the buyer." *Id.* This principle is inapplicable, however, if property is damaged *before* the exercise of a purchase option, because the option-holder "acquire[s] no interest in [the] real property, or any building thereon, *until* [the option-holder] exercise[s] its option to purchase . . . ." *Id.* at 647.

In this case, Mitchell failed to introduce evidence that he or Girlfriend exercised their option to purchase the house in either of the ways specified in the Lease Agreement: by entering a separate agreement for seller financing; or by tendering the purchase price and entering a separate agreement for a cash purchase. Because they had not exercised the option, they "acquired no interest in [the] real property, or any building thereon . . . ." *Riddle*, 52 S.W.3d at 647. The Lease Agreement does not provide any reasonable ground for Mitchell's subjective belief that he owned or was purchasing the house, and therefore had the right to damage or destroy it. To the contrary, the Lease Agreement makes clear that Mitchell remained a tenant on the property with an obligation to make monthly

9

rental payments. Mitchell was subject to eviction if he failed to pay the monthly rent; was subject to a contractual requirement that he "not cause or permit any waste or damage [to the property] other than normal wear and tear"; and would be subject to "appropriate legal action" if he "vacate[d] the premises in worse condition than at the time" the Lease Agreement was executed.

Because he failed to present evidence to suggest that he had a reasonable ground for a belief that he owned the property, Mitchell was not entitled to an instruction on the claim of right issue, even though he presented evidence of his own *subjective belief* that he acted within his rights. *See State v. Lynch*, 356 S.W.3d 810, 812 (Mo. App. S.D. 2012) (despite evidence that defendant believed he was justified in damaging third party's property due to third party's inappropriate relationship with defendant's disabled child, the circuit court properly refused to instruct on claim of right where "there was no evidence here that Defendant had title to, color of title to, or any belief, reasonable or otherwise, that he had any legal right by ownership, consent, or other legal process to damage the vehicle in question"); *State v. Cox*, 741 S.W.2d 74, 77 (Mo. App. S.D. 1987) (holding that circuit court properly refused to instruct jury on claim of right issue despite defendant's subjective belief in his claim of right, where the defendant "did not introduce any evidence, by deed or otherwise, showing that he held legal title, or even color of title, to that portion of the road which he admittedly damaged").

## Conclusion

The judgment of the circuit court is affirmed.

_____
Alok Ahuja, Judge

All concur.

10